THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: March 31, 2017

G. Michael Halfenger
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In the matter:

Jamiela Flournoy,          Case No. 16-21984-GMH

    Debtor.                 Chapter 13

## DECISION AND ORDER

      Jamiela Flournoy and Vernon Shaw jointly incurred debt to purchase a car. They gave the lender a lien on the car to secure repayment. Flournoy alone filed a chapter 13 case. She seeks to modify the creditor's rights through her chapter 13 plan so that the lien terminates when she receives a discharge. The creditor objects to plan confirmation.

      Because the Bankruptcy Code does not authorize Flournoy to eliminate the lien on Shaw's interest in the car, the court construes her plan

to modify the creditor's lien only on her interest. Based on that construction of the plan, the creditor's objection to confirmation is overruled.

I

Flournoy and Shaw bought a 2005 Dodge Durango in November 2014. CM-ECF Doc. No. 31-1 at 1–2. They made a $1,000 down payment. *Id.* at 2. They financed the balance with a 48-month retail installment contract that gave the seller a right to repayment at 23.99% interest and a lien on the Durango. *Id.* at 1–3. The retail installment contract makes Flournoy and Shaw jointly liable on the debt. *Id.* at 1. The seller assigned its rights under the contract to Credit Acceptance Corporation. *Id.* at 2, 4.

Flournoy filed this chapter 13 case in 2016. Shaw is not a debtor and he is not the debtor's spouse.

Flournoy proposes a debt-adjustment plan that pays Credit Acceptance the amount of its claim ($10,375.06), plus 5.5% interest in equal monthly payments over the duration of the plan. CM-ECF Doc. No. 20 at 3. The plan states in relevant part:

> Credit Acceptance Corporation shall be paid $10,375.06 at 5.5% interest with equal monthly payments of $198.18 for the 2005 Dodge Durango. Credit Acceptance Corporation shall retain the lien securing the claim until the earlier of the payment of the underlying debt determined by non-bankruptcy law or discharge under 11 USC § 1328.

CM-ECF Doc. No. 20 at 3. The plan does not propose to pay Credit Acceptance the full amount of interest owed by Flournoy and Shaw under nonbankruptcy law because it proposes to pay the claim at 5.5% interest, rather than the 23.99% interest required by the parties' contract.

Credit Acceptance does not question that Flournoy's plan may terminate its lien in her property when she obtains a discharge. CM-ECF Doc. Nos. 22, 24, 31, 46. Nor does it dispute that Flournoy's plan would

meet all confirmation requirements if she were the sole owner of the Durango and singularly liable on the debt. *Id.* It instead argues that chapter 13 does not authorize Flournoy to eliminate its lien on the Durango because the lien also secures Shaw's obligation to pay his debt under the installment contract. CM-ECF Doc. No. 31 at 2.

## II

Credit Acceptance first argues that Flournoy's plan fails to comply with 11 U.S.C. §524(e). As a result, Credit Acceptance asserts, the plan fails to meet §1325(a)(1)'s confirmation requirement that "the plan compl[y] . . . with the other applicable provisions of this title". See CM-ECF Doc. No. 46 at 3–4.

## A

Section 524(e) provides, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." According to Credit Acceptance, the plan's elimination of the vehicle lien offends this provision by improperly discharging Shaw's *in rem* liability:

> Vernon Shaw's liability is both *in personam* and *in rem*. Vernon Shaw's *in rem* liability is set forth in the Contract—and gives [Credit Acceptance] the right to pursue Vernon Shaw's liability *in rem*—against the Vehicle. Section 524(e) states that Debtor's discharge does not affect Vernon Shaw's *in rem* liability under the Contract.

CM-ECF Doc. No. 24 at 9–10.

Credit Acceptance improperly conflates the effect of the bankruptcy discharge and the claim-modifying effect of a chapter 13 plan. A bankruptcy discharge generally bars collection of pre-petition debt from

the debtor personally.[1] 11 U.S.C. §524(a). Section 524, which governs the effect of discharge, provides that a discharge voids any judicial "determination of the personal liability of the debtor" and "operates as an injunction against the commencement or continuation of an action . . . or an act, to collect, recover or offset . . . [discharged] debt as a personal liability of the debtor". 11 U.S.C. §524(a)(1), (2).

The discharge thus does not affect creditors' lien rights in property, even in the debtor's property. Enforcing a lien—a "charge against or interest in property to secure payment of a debt" (11 U.S.C. §101(37))—is not an act to collect or recover the debt "*as a personal liability of the debtor*". 11 U.S.C. §524(a)(2) (emphasis added). If the Code were not clear enough, the Supreme Court has repeatedly ruled that a "bankruptcy discharge . . . leav[es] intact . . . an action against the debtor *in rem*." *Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991); see also *Dewsnup v. Timm*, 502 U.S. 410, 418 (1992). By limiting the discharge's effect to enforcement of personal liability, §524 maintains the long-standing principle that liens pass through bankruptcy unaffected. See *Long v. Bullard*, 117 U.S. 617 (1886). As §524(e) makes clear, this principle applies equally to liens on property owned by others.

While §524 limits the effect of discharge, it does not limit the authority to modify creditors' rights found in the Bankruptcy Code's reorganization chapters. As the Seventh Circuit has observed, "the principle that liens pass through bankruptcy unaffected cannot be taken literally". *In re Penrod*, 50 F.3d 459, 462 (7th Cir. 1995). When a plan of reorganization provides for an allowed secured claim, the claimholder's rights survive only to the extent provided in the plan or in the order confirming the plan. And, in reorganization bankruptcies, "the default rule

---

[1] The discharge's protection of community property provides a narrow exception from this principle that discharge is *in personam*, not *in rem*. See 11 U.S.C. §524(a)(3); see also 11 U.S.C. §§101(7), 541(a)(2). Flournoy and Shaw are not spouses, so there can be no community claim at issue. This decision ignores this inapplicable exception.

for secured creditors who file claims for which provision is made in the plan of reorganization is extinction". *Id.* at 462. Indeed, a plan's ability to free the debtor's property of pre-bankruptcy liens is a hallmark of reorganization bankruptcies. See *id.*; *Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 519 F.3d 640, 648 (7th Cir. 2008) ("[I]f a secured creditor participates in the debtor's bankruptcy and the ultimate plan does not preserve the creditor's interest, the interest is gone."); see also *In re 620 Church St. Bldg. Corp.*, 299 U.S. 24, 26–27 (1936) (reorganization plan under the Bankruptcy Act could eliminate junior liens that had no value).

While *Penrod* involved a plan under chapter 11, chapter 13 similarly authorizes debt-adjustment plans to eliminate liens that secure allowed claims that the debtor pays through a confirmed plan. See 11 U.S.C. §1322(b)(2); see also *In re Pence*, 905 F.2d 1107, 1110 (7th Cir. 1990) (holding that creditor was bound by a chapter 13 plan that provided for full repayment of its claim and release of its lien). Section 1322(b)(2) generally authorizes a debt-adjustment plan to "modify the rights of holders of secured claims". See 11 U.S.C. §1322(b)(2). One of these rights that a plan may modify is "the right to retain the lien until the debt is paid off". *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329 (1993).

Section §524(e)'s restriction on the effect of the *discharge* does not limit the *plan's* authority to modify the rights of holders of secured claims. The limitations on the plan's authority are found in §§1322(b)(2) and 1325(a)(5). See *In re Mensah-Narh*, 558 B.R. 134, 139–140 (Bankr. D. N.J. 2016); *In re Okosisi*, 451 B.R. 90, 95 (Bankr. D. Nev. 2011).

Flournoy's plan provides that Credit Acceptance retains its lien until paid in full under nonbankruptcy law or until Flournoy receives a discharge, which cannot issue until she completes the plan (see 11 U.S.C. §1328(a)). This provision mirrors the mandate of 11 U.S.C. §1325(a)(5)(B)(i)(I). Section 1325(a)(5)(B)(i)(I) provides that if a debtor is retaining the collateral and a holder of an allowed secured claim provided

for in her chapter 13 plan does not accept the plan, then the plan may only be confirmed if the plan provides that the secured creditor retains its lien until either (a) the creditor is paid the amount owed under nonbankruptcy law, or (b) the debtor receives a chapter 13 discharge. 11 U.S.C. §1325(a)(5)(B)(i)(I).

Flournoy's discharge will only bar collection from her person, not from her property. It will have no effect on Credit Acceptance's ability to collect the debt from the Durango (or from Shaw personally), and the plan does not provide otherwise. Discharge, under Flournoy's plan, triggers termination of the lien, as mandated by 11 U.S.C. §1325(a)(5)(B)(i)(I)(bb), but the plan, rather than the discharge, modifies the lien.

Flournoy's plan thus does not violate §524(e) by impermissibly expanding the scope of the discharge. See 11 U.S.C. §1328. Compare *United Student Aid Funds v. Espinosa*, 559 U.S. 260 (2010) (plan impermissibly provided for discharge of student loans absent undue hardship in contravention of 11 U.S.C. §§523(a)(8) and 1328(a)(2)). The plan conforms to §1325(a)(1)'s mandate that it comply with the applicable provisions of the Bankruptcy Code.

B

Credit Acceptance next argues that by eliminating its lien (and thus its ability to enforce Shaw's obligation to pay the debt from the Durango) the plan exceeds §1322(b)(2)'s authorization to modify the rights of secured creditors.

1

Credit Acceptance emphasizes that Shaw, a non-debtor, is obligated to pay the debt and that the installment contract affords Credit Acceptance the right to enforce Shaw's obligation against the Durango. As discussed above, §524(e) ensures that Shaw will remain liable on the debt. Credit Acceptance is free to pursue Shaw for any remaining debt that Flournoy's

plan does not pay—that is, the difference between the 23.99% contract-rate interest and the 5.5% interest rate provided for in Flournoy's plan.[2]

a

Credit Acceptance contends that Flournoy's plan cannot eliminate its ability to collect Shaw's full contract debt from the Durango. According to Credit Acceptance, all of its "rights related to the non-filer [Shaw] are outside the reach of Section[s] 1322(b)(2), 1325(a)(5)(B)(i)—and are also outside the jurisdiction of this Bankruptcy Court." CM-ECF Doc. No. 24 at 15.

Jurisdiction is not an issue. This court has jurisdiction to decide the extent to which a debtor's plan may modify a creditor's rights under the parties' contract. Credit Acceptance has filed a claim against Flournoy and opposed plan confirmation. Plan confirmation is a core proceeding under title 11. See 28 U.S.C. §§157(b)(2)(L) & 1334(a); see also Order of Reference (E.D. Wis. 1984), available at http://www.wied.uscourts.gov.

Credit Acceptance's argument is better considered as one contending that the plan's purported elimination of the lien as a means to collect Shaw's obligation from the Durango exceeds the authority of §1322(b)(2).

b

Sections 1322 and 1325 do not expressly prohibit a plan's modification of a secured claimholder's right to enforce a lien that charges co-owned property. The Code's text does not address the issue. If the prohibition for which Credit Acceptance argues exits, it must be premised on an unstated limitation on §1322(b)(2)'s authority to "modify the rights of holders of secured claims . . . or of holders of unsecured claims".

---

[2] The "co-debtor stay," 11 U.S.C. §1301(a), prohibits Credit Acceptance from pursuing collection from Shaw while Flournoy's case is pending, at least in the absence of an order relieving Credit Acceptance of that section's restraint. See 11 U.S.C. §1301(c).

Credit Acceptance is a claimholder for §1322(b)(2) purposes—it "has a claim against the debtor that arose . . . before the order for relief concerning the debtor". 11 U.S.C. §101(10)(A). In addition to a claim based on the right to collect from Flournoy personally, Credit Acceptance has a claim based on its right to collect the debt from the Durango.

A "claim" is, among other things, a "right to payment" from the debtor or from the debtor's property. 11 U.S.C. §101(5)(A), (B). Section 102(2) makes clear that "'claim against the debtor' includes [a] claim against property of the debtor." See also 11 U.S.C. §502(b)(1) (providing for disallowance of claims that are "unenforceable against the debtor and property of the debtor"). The Supreme Court has adhered to the plain meaning of these Code sections: "a creditor who . . . has a claim enforceable only against the debtor's property nonetheless has a 'claim against the debtor' for purposes of the Code." *Johnson*, 501 U.S. at 85.

Flournoy and Shaw, acting together, pledged the entire Durango (both of their undivided interests in the whole) to secure repayment of the debt on which they are jointly liable. The installment contract states, "You [defined as Flournoy and Shaw, jointly and severally] give Us [the seller and Credit Acceptance as seller's assignee] a security interest in: 1). The Vehicle [defined as the Durango] and all parts or goods installed in it". CM-ECF Doc. No. 31-1 at 3. Flournoy and Shaw both signed the contract. CM-ECF Doc. No. 31-1 at 2. They are both liable on the debt, and they both charged their interests in the Durango to secure that debt. As a result, Credit Acceptance's right to collect Flournoy's—and Shaw's—obligation from Flournoy's interest in the Durango is a "claim" against Flournoy under the Bankruptcy Code. See *Johnson*, 501 U.S. at 85–86. That claim is subject to §1322(b)(2). Flournoy's plan can modify Credit Acceptance's rights as a holder of that claim, including eliminating the lien on her interest in the Durango at the time of discharge.

Flournoy, however, is not the sole owner of the Durango. CM-ECF Doc. No. 31-1. Flournoy and Shaw purchased it together, *id*. at 1–6, and titled it in both their names, *id*. at 6 (title listing ownership as "Flournoy Jamiela Y and Shaw Vernon E A") (internal capitalization altered from original). Flournoy and Shaw thus each own an equal undivided interest in the Durango as a tenant in common. Wis. Stat. §§700.18, 700.20. Each can unilaterally alienate only his or her own interest in the property. See *Trs. of Ashland Lodge, No. 63, I.O.O.F. v. Williams*, 75 N.W. 954, 956 (Wis. 1898) ("Certainly, it is not the law that one tenant in common can in any way dispose of his co-tenant's interest in the common property without the consent of such co-tenant. In case of such a sale the wrongdoer is answerable to the co-tenant for his interest in the property, or the wronged co-tenant may still claim such interest as a co-tenant with the vendee."); see also *Kuenzi v. Leisten*, 271 N.W. 18, 19 (Wis. 1937) ("In Trustees of Ashland Lodge No. 63, I.O.O.F. v. Williams, supra, it is held that where two persons are tenants in common of personal property under a chattel mortgage, neither can maintain replevin against the other to recover such property, or against the mortgagee for delivering the property to such other, or legally sell any interest therein, except his own, without the consent of his cotenant.").[3]

Shaw encumbered his ownership interest in the Durango when he granted a lien to secure his obligation to make the payments under the installment contract. Credit Acceptance's right to collect the debt from Shaw's interest in the Durango is not a claim against Flournoy or against

---

[3] Section 700.22(3), Wis. Stat., excepts transfers of interests in vehicles from Wis. Stat. §§700.17 through 700.21 to the extent the transfer is governed by Wis. Stat. §342.15(1)(d). But §342.15(1)(d) only applies to vehicles titled by owners that are owners in the alternative, rather than joint owners, as here. See Wis. Stat. §342.15(1)(d) ("Notwithstanding s. 340.01(42), any person who holds legal title of a vehicle with one or more other persons may, after June 1, 1997, transfer ownership of the vehicle under this subsection if legal title to the vehicle is held in the names of such persons in the alternative, including a vehicle held in a form designating the holder by the words '(name of one person) or (name of other person)'.").

Flournoy's property. Therefore, it is not a "claim" subject to modification by Flournoy under §1322(b)(2).

2

This conclusion—that Credit Acceptance's right to collect from Shaw's interest in the Durango is not a "claim"—is supported by the observation that a contrary ruling would require construing §1322(b)(2) in a manner that would allow plans to eliminate liens on some jointly owned property without paying creditors the full value of their collateral. To see this, consider the consequence of Flournoy's preferred rule had Flournoy and Shaw purchased the Durango more than 910 days before Flournoy filed her bankruptcy case. Because §1325(a)'s hanging paragraph would not apply in these hypothetical circumstances, §1325(a)(5)(B) would allow confirmation of a plan that paid Credit Acceptance only the value of the allowed secured claim as defined by §506(a). Section 506(a) limits the allowed secured claim to the value of the bankruptcy estate's interest in the property: "An allowed claim of a creditor secured by a lien on property in which the estate has interest . . . is a **secured claim to the extent of the value of such creditor's interest** *in the estate's interest* in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. §506(a) (all emphasis added). Flournoy's bankruptcy estate is limited to her interest in the Durango. See 11 U.S.C. §541(a)(1) (the bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case"). So, if §506(a) applied, Credit Acceptance's allowed secured claim would equal one-half the Durango's value. And, under these hypothetical facts, Flournoy could confirm a plan consistent with §1325(a)(5)(B) that provided for elimination of the lien upon discharge as long as her plan paid Credit Acceptance the present value of its "allowed secured claim"—that is, one-half the car's value.

Thus, if one accepts Flournoy's position, a debtor's plan could eliminate the lien on co-owned collateral to which §506(a) applies without paying the full value of the collateral through the plan. That outcome is contrary to the long-recognized principle, embodied in §506, that secured creditors are generally entitled to be paid in bankruptcy the amount of their claim up to the value of their collateral. See *Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278 (1940) ("[s]afeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property. . . . There is no constitutional claim of the creditor to more than that."); see also *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935). That Flournoy's preferred construction is in conflict with this principle is good reason not to adopt it in the absence of controlling statutory text. See *Dewsnup*, 502 U.S. at 419–20.

The approach adopted here remains consistent to the principle that debt-adjustment plans that eliminate liens on a debtor's property must minimally pay the creditors holding those liens the value of their collateral. After Flournoy obtains a discharge, Credit Acceptance will receive the value of its lien on Flournoy's interest (as determined by §1325(a)'s hanging paragraph) through the plan. It will continue to hold the right to collect the remaining debt as determined under nonbankruptcy law only from Shaw personally and from Shaw's interest in the Durango.

III

Flournoy's plan provides, "Credit Acceptance Corporation shall retain the lien securing the claim until the earlier of the payment of the underlying debt determined by non-bankruptcy law or discharge under 11 USC § 1328." CM-ECF Doc. No. 20 at 3. As discussed above, Credit Acceptance's "claim" includes a right to payment from Flournoy personally and, because she granted a lien on her interest in the Durango to secure payment of the debt, a right to payment from that interest. Flournoy's plan can eliminate that lien upon the earlier of the underlying

debt being paid as calculated under nonbankruptcy law or a discharge. See 11 U.S.C. §1325(a)(5)(B)(i)(I).

The court may confirm Flournoy's plan, understanding the plan to modify Credit Acceptance's lien on Flournoy's interest in the Durango but leaving intact Credit Acceptance's lien on Shaw's interest. Based on this understanding, Credit Acceptance's objection to the plan is overruled.

If Flournoy desires to amend her plan in light of this decision's construction of it, she must do so on or before April 28, 2017. If Flournoy's amended plan modifies only the plan's treatment of Credit Acceptance's claim, then Flournoy may limit service to Credit Acceptance, the chapter 13 trustee, and the United States Trustee.

#####